JUDGE COTE

**08 CV 6728**

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

UNITED STATES SECURITIES AND
EXCHANGE COMMISSION,

                Plaintiff,

                v.

GEORGE J. SIMCHUK,

                Defendant.

Case No.



RECEIVED JUL 29 2008 U.S.D.C. S.D.N.Y. CASHIERS

## COMPLAINT

Plaintiff the United States Securities and Exchange Commission ("Commission") alleges as follows:

### SUMMARY

1. This is an insider trading case involving George J. Simchuk ("Simchuk" or "Defendant"), formerly employed as the General Director of Glamis de Mexico, a wholly-owned subsidiary of Glamis Gold, Inc. ("Glamis"). On February 24, 2006, Glamis announced that it had signed a binding letter agreement to acquire Western Silver Corp. ("Western Silver"), an American Stock Exchange publicly traded company based in Vancouver, British Columbia. Following the announcement of the merger agreement, the share price of Western Silver increased 27%, from a close of $16.98 on February 23, 2006 to a close of $21.60 on February 24, 2006.

2. Simchuk first learned of the potential acquisition of Western Silver in late November 2005 in connection with his official duties assisting in the due diligence process on behalf of Glamis. A few days later, on December 1, 2005, Simchuk began purchasing Western Silver stock. From December 2005 through February 2006, during which time he remained privy to material, nonpublic information concerning Glamis' potential acquisition of Western Silver, Simchuk intermittently purchased a total of 6,000 shares of Western Silver stock. Simchuk's unlawful purchases ultimately resulted in gains to him totaling $58,206.

3. By engaging in the conduct described above, Simchuk violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] promulgated thereunder.

## JURISDICTION

4. This Court has jurisdiction over this action pursuant to authority conferred by Sections 21(d), 21(e) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 77u(e) and 78aa].

5. Venue lies in this district pursuant to Section 27 of the Exchange Act [15 U.S.C. §78aa]. Certain of the transactions, acts, practices, and courses of business constituting the violations alleged herein occurred within this District.

## THE DEFENDANT

6. Defendant George J. Simchuk is a 69 year old retiree residing in Sagle, Idaho. From the commencement of his employment in January 2005 until January 2006, Simchuk was employed as the general manager of Glamis' El Sauzal mine located in

Mexico. Beginning in mid-January 2006, Simchuk assumed the title of General Director of Glamis de Mexico.

## FACTS

7. On November 26, 2005, while visiting family over the Thanksgiving holiday weekend, Simchuk was informed via an e-mail from Glamis' chief operating officer of Glamis' interest in potentially acquiring Western Silver, a publicly traded mineral exploration company, and its property known as the Peñasquito Project (the "Project"). Simchuk confirmed his receipt of this e-mail by responding via e-mail on November 27, 2005.

8. As an active member of the Peñasquito Project working group, Simchuk's responsibilities entailed assisting Glamis in its due diligence of the Project, including: (a) overseeing due diligence on the Project, (b) acting as coordinator of such due diligence information, (c) reviewing reserves, recovery, permitting, land surface matters, environmental and water issues, (d) meeting and speaking with Western Silver personnel and visiting the Project site in Mexico, and (e) presenting his findings and recommendations to the Glamis Board of Directors. Simchuk also received a password and was granted access to Western Silver personnel files. In addition, he received a copy of a confidentiality agreement executed between Western Silver and Glamis pursuant to which Glamis and its employees were bound to keep in strict confidence and not disclose to third parties any information obtained in the course of its due diligence. Thus, from at least November 2005, Simchuk was entrusted with, or had ready access to, material, non-public information concerning the Project and Glamis' potential acquisition of Western Silver.

9. In addition, throughout his employment at Glamis, Simchuk was subject to Glamis' Code of Business Conduct and Ethics ("Code of Conduct") and its Disclosure Policy, both of which expressly prohibited employees from trading in securities while in possession of material non-public information. Among other things, the Code of Conduct outlines the company's policies regarding conflicts of interest and insider trading. The section entitled "Insider Trading" provides, in pertinent part:

> Employees, officers and directors who have access to confidential information are not permitted to use or share that information for stock trading purposes or for any other purpose except the conduct of our business. All non-public information about the Company (or about any other company) should be considered confidential information. To use non-public information for personal financial benefit or to "tip" others, including family members, who might make an investment decision on the basis of this information is not only unethical but also illegal.

Moreover, Glamis' Disclosure Policy includes a section entitled "Trading Restrictions and Blackout Periods" which states, in relevant part:

> It is illegal to purchase or sell securities of any public company with knowledge of material information affecting that company that has not been publicly disclosed. Except in the necessary course of business, it is also illegal for anyone to inform any other person of material non-public information. Therefore, insiders and employees with knowledge of confidential or material information about the Company or any counterparties in negotiations of material potential transactions are prohibited from trading shares in the Company or any counter party until the information has been fully disclosed and a reasonable period of time has passed for the information to be widely disseminated.

The Disclosure Policy also expressly prohibits any employee "privy to confidential information from communicating such information to anyone else, unless it is necessary to do so in the course of business."

- 5 -

10.     Finally, Simchuk executed an annual Conflict of Interest Questionnaire which stated, in relevant part: "It is company policy that each employee be free of any investments, associations, or other relationships that could conflict with his or her responsibility to act objectively in matters affecting the company." Among other questions, the questionnaire specifically asks employees to disclose whether they have an ownership interest or financial interest in any organization that, to the employer's knowledge, is a candidate for acquisition by the company.

11.     Glamis' Code of Conduct was implemented in March 2002 and was periodically delivered to all Glamis employees, including Simchuk. The Disclosure Policy was available on Glamis' website in the "Corporate Governance" section. Simchuk executed the Conflict of Interest Questionnaires in January 2005, April 2005 and April 2006.

12.     At all relevant times, Simchuk knew that he was subject to Glamis' Code of Conduct, Disclosure Policy and Conflict of Interest Policy.

13.     On December 1, 2005, while in possession of confidential non-public information concerning the potential acquisition of Western Silver by Glamis, Simchuk began buying Western Silver stock. Specifically, from December 1, 2005 to December 30, 2005, Simchuk purchased a total of 4,000 shares of Western Silver, at average prices ranging from $8.58 per share to $11.23 per share.

14.     On January 4, 2006, Simchuk attended a meeting at Western Silver's offices in Vancouver to discuss technical developments on the Project.

15.     During February 9 and 10, 2006, Glamis held a regularly scheduled meeting of its Board of Directors in Reno, Nevada at which Glamis management made a

presentation to the Glamis Board regarding Western Silver, its assets and the structure and economics of a potential transaction with Western Silver. Simchuk attended portions of the meeting and participated in a presentation to the Board in which he discussed the location, infrastructure, permitting, water, labor, governmental and other issues associated with the Project and responded to numerous questions from the directors. Simchuk explained the significant amount of due diligence undertaken by his team at the Project site, at Western Silver's offices in Vancouver and at the feasibility and resource contractors' offices in Arizona.

16. On February 9, 2006, while in attendance at the Glamis Board meeting, and armed with the knowledge that Glamis management would recommend that the Board approve the proposed transaction with Western Silver, Simchuk purchased 2,000 additional shares of Western Silver stock at an average price of $14.95 per share.

17. On February 24, 2006, Glamis announced publicly that it had signed a binding letter agreement to acquire Western Silver at an exchange rate of 0.688 Glamis shares and one share of a new exploration and development company for each Western Silver share. Following the announcement, Western Silver's share price increased 27%, from a close of $16.98 on February 23, 2006 to a close of $21.60 on February 24, 2006.

18. At the time Simchuk executed his purchases in Western Silver, Simchuk was in possession of material, non-public information concerning Glamis' potential acquisition of Western Silver.

19. Simchuk's unlawful trading resulted in gains to him totaling $58,206.

## CLAIM FOR RELIEF

**Violations of Section 10(b) of the Exchange Act
[15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder
[17 C.F.R. § 240.10b-5]**

20.  The Commission realleges and incorporates by reference paragraphs 1 through 19 above.

21.  As set forth more fully above, Simchuk, directly or indirectly, acting with scienter, by use of the means or instrumentalities of interstate commerce, or by the use of the mails or of the facilities of a national securities exchange, in connection with the purchase or sale of securities: has employed devices, schemes, or artifices to defraud, has made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or has engaged in acts, practices, or courses of business which operate or would operate as a fraud or deceit upon any person.

22.  By reason of the foregoing, Simchuk violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court enter a final judgment:

a) Permanently enjoining Defendant Simchuk from committing future violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

b) Ordering Simchuk to disgorge ill-gotten gains, with prejudgment interest thereon;

c) Ordering Simchuk to pay civil monetary penalties pursuant to Section 21A of the Exchange Act [15 U.S.C. § 78u-1]; and

d) Granting such other relief as this Court deems just and proper.

Dated: July 28, 2008

Respectfully submitted,

*/s/ Alan M. Lieberman*

Alan M. Lieberman (AL-6517)
Cheryl J. Scarboro
John Reed Stark
Thomas A. Sporkin
Carolyn E. Kurr
Sarit Klein
100 F Street, N.E.
Washington, D.C. 20549-5631
Telephone: (202) 551-4474 (Lieberman)
Facsimile: (202) 772-9245
liebermana@sec.gov

Attorneys for Plaintiff